**COHENMILSTEIN**

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/5/17

Daniel A. Small
202.408.4610
dsmall@cohenmilstein.com

October 1, 2017

RECEIVED
OCT 5 - 2017
CHAMBERS OF
JUDGE MARRERO

*Via Hand Delivery*

The Hon. Victor Marrero
U.S. District Court for the Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, NY 10007

    Re:    *NYU Hospitals Center v. League of Voluntary Hospitals and Homes of New York, et. al*, No. 17-cv-4465 (S.D.N.Y.)

Dear Judge Marrero:

    Pursuant to Rule II.B.2 of Your Honor's Rules of Individual Practice, I write on behalf of 1199SEIU United Healthcare Workers East ("1199" or "Union") to explain why a motion to dismiss remains warranted. NYU's proposed amended complaint, like its first complaint, objects to the amount of NYU's contributions to the 1199SEIU National Benefit Fund (the "Fund") after NYU purportedly withdrew from the League of Voluntary Hospitals and Homes of New York (the "League"). As both complaints acknowledge, that amount was determined by the Fund in accordance with its methodology for ensuring an actuarially sound fund, and none of the complaint's allegations plausibly suggest that the Fund's decision was the result of the alleged conspiracy. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).[1] A brief review of the proposed amended complaint's allegations makes this clear.[2]

    In July 2014, the Union and the League executed a Memorandum of Agreement ("MOA") extending their prior collective bargaining agreement through September 2018, with some modifications. Am. Compl. ¶¶ 26-28. As part of that MOA, they agreed to a schedule for League members' contributions to the Fund that combined contribution rates (a percentage of wages) with a contribution cap. They further agreed that "[t]he Fund administration, together with the actuaries, shall develop a practicable contribution methodology, subject to the approval of the [Fund] Trustees that effectuates the above schedules." *Id.* ¶¶ 28, 31. In October 2014, the Fund proceeded to do exactly what the parties agreed to: Milliman, the Fund's actuary, developed a methodology to implement the contribution schedule and the Fund's trustees adopted it. *Id.* ¶¶ 32-33; Ex. 3 (Oct. 27, 2014 Fund Trustees' resolution). The Union and the League subsequently incorporated the Fund's methodology into the MOA. *Id.* ¶ 38.

---

[1] While NYU alleges that the Fund's decision was made pursuant to an instruction from the Union, *see* Am. Compl. ¶¶ 44-45, this allegation is not supported by any underlying facts, and regardless, an agreement between a union and a labor-management trust fund would be protected from antitrust claims by the statutory labor exemption, 15 U.S.C. § 17. *See Tuvia Convalescent Ctr., Inc. v. Nat'l Union of Hosp. & Health Care Employees*, 553 F. Supp. 303, 307 (S.D.N.Y. 1982).

[2] Copies of the prior correspondence between the Union and NYU are attached for your convenience.

A substantial number of Union members are employed by institutions that are not members of the League, and so the Fund's actuaries also developed a contribution rate and methodology applicable to non-League contributing employers. Milliman's task was to develop a rate and methodology that, with the contributions from League employers, would result in a fully funded and actuarial sound common fund for all Union members. *See* Ex. 3 (Fund Trustees' resolution), at 2 ("Whereas, working with the Fund actuaries, the Trustees have determined the benefit rates required for Non-League Employers to adequately fund the benefit plan . . . ."). And because, for the first time, the Fund had different methodologies for League and non-League institutions, Milliman also developed a movement rule, for any institutions leaving or joining the League during the term of the MOA. The rule provided that any institutions leaving the League would contribute under the non-League methodology, and any institutions joining the League would contribute under the League methodology. Am. Compl. ¶ 37. Milliman described the non-League methodology and the movement rule in the same October 2014 report that contained the League methodology. *Id.* ¶¶ 35, 37. Later that month, the Fund's trustees unilaterally approved both the League and non-League rates and methodology in a single resolution. *See* Ex. 3.

Over a year later, in March 2016, NYU withdrew from the League. The Fund, applying the movement rule described in the October 2014 Milliman report, determined that NYU's contribution should be calculated according to the non-League methodology. Am. Compl. ¶ 45. The amended complaint is simply devoid of any facts suggesting that the Fund's decision was the result of the alleged conspiracy. Moreover, new allegations added to the proposed amended complaint actually undercut any suggestion of conspiracy.

First, NYU now alleges that the conspiracy was formed in December 2014 when the League and Hospital defendants became aware that the Fund intended to apply the movement rule contained in the Milliman report to future changes in League status, and infers agreement from defendants' mere failure to object to it. *Id.* ¶¶ 39-40, 58. But there is no reason, and NYU provides none, why the League, or any of its members, would respond at all to a provision concerning institutions that have left the League. Similarly, there is no reason, and none is alleged, why the Fund would seek agreement for a movement rule from the League (or any of its members), when the Fund was authorized by the MOA to develop a "practicable contribution methodology" to "effectuate[]" the MOA's contribution schedules. Moreover, the complaint's silence on how the agreement was formed is telling given that NYU in December 2014 was both a League member and a Fund trustee. Despite being in "the thick of things," NYU can allege nothing about how the alleged conspiracy was formed.

Second, the proposed amended complaint adds allegations that make the complaint internally inconsistent. While NYU now claims that all defendants reached a "meeting of the minds" in December 2014, *id.* ¶ 40, the Fund's actuaries developed the movement rule earlier, in October 2014, *id.* ¶ 37. Additionally, the change in NYU's contribution rate cannot both be "[i]n reaction" to NYU's withdrawal in 2016, *id.* ¶ 3, *and* the result of an alleged agreement reached over a year before that withdrawal. And the movement rule could not have been adopted, as NYU alleges, to penalize and deter institutions that leave, or consider leaving, the League. The non-League rate is not a penalty for leaving the League; it applies to all non-League contributing employers, not just employers withdrawing from the League. Furthermore, the League and non-League contribution methodologies themselves contradict any notion that the non-League methodology was intended to penalize withdrawals. The amounts that a given League member

would pay under the two methodologies depend on its wages and payroll; in fact, some League members would pay less if they switched to the non-League methodology.

For these reasons, and those laid out in the Union's August 23 pre-motion letter, NYU has failed to plausibly allege—in either its original or its proposed amended complaint—an antitrust conspiracy. However, even if it had, NYU's complaint should still be dismissed. First, as discussed in the August 23 letter, the Union's alleged conduct is protected by the non-statutory labor exemption. Ex. 1 (Union Letter to NYU), at 2-3. That NYU now repeatedly calls its Fund contributions a "direct restraint on a business market" does not make them so. To the contrary, NYU alleges that the restraint is in the labor market, by raising NYU's cost of providing employee benefits. Am. Compl. ¶¶ 4, 45. NYU's definition of "direct" would render the second prong of *Local 210* a nullity. Additionally, given that the disputed amount is less than one half of one percent of NYU Langone Medical Center's budgeted 2017 operating revenues, Ex. 1 at 3 n.3, and NYU is just one of dozens of general acute care hospitals in New York City, NYU has also failed adequately to allege that the purported restraint has "substantial anticompetitive effects" in a business market, as required by *Local 210*.

Second, NYU fails to adequately allege harm to competition, as set out in the Union's August 23 letter. Ex. 1 at 3. While NYU's amended complaint adds allegations of investments NYU purports to have made, it still fails to demonstrate that an annual reduction of $25 million in investments—assuming all of the money would have been invested in capital improvements—would have a material effect in a multi-billion dollar market, or that the "penalty" has even had any effect on NYU's investments, *see* Am. Compl. ¶ 69 (alleging only that "one or more" unspecified projects are in "jeopardy").

Finally, NYU's proposed amended complaint adds a claim against the Union under § 303 of the LMRA. *Id.* ¶¶ 73-82. Section 303 provides a narrow exception to the NLRB's exclusive primary jurisdiction over unfair labor practice complaints where a union is alleged to have violated NLRA Section 8(b)(4). Here, NYU attempts to allege a violation of Section 8(b)(4)(ii)(A), which makes it an unfair labor practice for a union to threaten, coerce or restrain an employer in or affecting interstate commerce for the purpose of forcing or requiring the employer to join an employer organization. *See* 29 U.S.C. § 158(b)(4)(ii)(A). NYU asserts in conclusory fashion that having to pay the non-League contribution rate "constitutes unlawful coercion and restraint within the meaning of § 8(b)(4)(ii)." Am. Compl. ¶ 77. However, as discussed above, and in our previous letter, the Fund's application of the movement rule—which was developed by its actuaries over a year before NYU decided to withdraw from the League, and is generally applicable to all non-League employers—cannot plausibly be construed as a "penalty." Simply, put NYU is unhappy with its contribution rate to the Fund. But, such displeasure with the application of the Fund's rules regarding contributions rates does not constitute "coercion" or "restraint." Thus, NYU's Section 303 claim should be dismissed for failure to state a claim.

In sum, the Fund did exactly what its independent actuaries had proposed, over a year before NYU withdrew from the League: applied the non-League contribution rate to an employer who withdrew from the League. NYU has offered no plausible allegations that the Fund's determination to do so was the result of any anticompetitive agreement, and its complaint should be dismissed.

**COHENMILSTEIN**
Page 4

Respectfully submitted,

Daniel A. Small
*Counsel for 1199SEIU United Healthcare Workers East*

Attachments

cc: David I. Gelfand, counsel for NYU Hospitals Center (dgelfand@cgsh.com)
Ronald E. Richman, counsel for 1199SEIU National Benefit Fund (ronald.richman@srz.com)
Derek Ludwin, counsel for the League of Voluntary Hospitals and Homes (dludwin@cov.com)
Randy M. Mastro, counsel for The Mount Sinai Hospital, Montefiore Health System, Inc., The New York and Presbyterian Hospital, and Long Island Jewish Medical Center (rmastro@gibsondunn.com)

---

The Clerk of Court is directed to enter into the public record of this action the letter above submitted to the Court by Defendant 1199SEIU United Healthcare Workers East

**SO ORDERED.**

10-5-17
DATE — VICTOR MARRERO, U.S.D.J.

# EXHIBIT 1

# COHENMILSTEIN

Daniel A. Small
202.408.4610
dsmall@cohenmilstein.com

August 23, 2017

*Via Electronic Mail*

David A. Gelfand
Cleary Gottlieb Steen & Hamilton LLP
2000 Pennsylvania Avenue
Washington, DC 20006
dagelfand@cgsh.com

    Re: *NYU Hospitals Center v. League of Voluntary Hospitals and Homes of New York, et. al, No. 17-cv-4465 (S.D.N.Y.)*

Dear David:

    On behalf of 1199SEIU United Healthcare Workers East ("1199" or "Union"), I write to set forth the basis for our anticipated motion to dismiss the claim against the Union.

    There are three independent reasons why NYU's claim against the Union should be dismissed. The first two—NYU fails to plausibly allege an antitrust conspiracy, and the non-statutory labor exemption protects the Union's conduct—are based on the fact that NYU's obligation to contribute to the 1199SEIU National Benefit Fund (the "Benefit Fund") arises from and is governed by the collective bargaining agreement (the "CBA") between the League of Voluntary Hospitals and Homes of New York (the "League") and the Union. The Union has an independent obligation on behalf of its members to enforce the CBA, and no allegation in the complaint plausibly suggests that the Union did anything other than independently interpret and seek to enforce the CBA as to NYU. And, the Union's conduct in interpreting and seeking to enforce the health insurance provisions of the CBA (a mandatory subject of bargaining) is exempt from the antitrust laws under the non-statutory labor exemption.[1] The third ground is the lack of any factual allegations plausibly suggesting that the (inadequately) alleged conspiracy harmed competition.

## 1. *NYU Has Failed to Plausibly Allege an Antitrust Conspiracy*

    NYU has failed to plausibly allege an antitrust conspiracy under *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007). To do so, a complaint must include more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Id.* at 555. Rather, it must allege "enough factual matter (taken as true) to suggest that an agreement was made." *Id.* at 556. It is not enough merely to attach a conspiracy label to conduct that is in the independent

---

[1] NLRB Case No. 2-CA-190119 is evidence that this case, first and foremost, presents a labor dispute, not an antitrust claim. The National Labor Relations Board's General Counsel issued a complaint alleging that NYU "has withdrawn authorization from the League to represent [it] in multiemployer bargaining with the Union at a time when [it] is obligated to bargain through the League on a multiemployer basis." NLRB Complaint ¶ 10(b). This lawsuit assumes that NYU's purported withdrawal was lawful under federal labor law, but that question is pending before the NLRB, and resolution of that question could moot the relief requested by NYU.

self-interest of each defendant. *Twombly*, 550 U.S. at 566 (conduct that "was only natural anyway" does not imply a conspiracy).

Here, the only allegedly conspiratorial conduct by the Union was to send a letter to the Benefit Fund instructing the Fund, in light of NYU's purported withdrawal from the League multi-employer bargaining unit, to recalculate NYU's contribution using the non-League methodology proposed by the Fund's actuaries, and to send a copy of that letter to the League, NYU, and others. Compl. ¶ 39; undated ltr. from Ratner to Behroozi (Ex. A). This alleged "instruction" was based on the Union's interpretation of the CBA. *Id.*[2]

The complaint is wholly silent as to any other allegedly conspiratorial conduct, including any by the League or the individually-named Hospitals, and instead alleges unilateral action by the Benefit Fund. After considering NYU's objection to paying the non-League rate, the Benefit Fund made "its decision" to "require[]" NYU to make contributions to the Fund under the non-League methodology. Compl. ¶ 40; *see id.* ¶ 3 (the Fund "determined" that NYU would be required to pay the non-League rate). Without more, the complaint then alleges that all Defendants "encouraged and acquiesced" in the Benefit Fund's determination. *See* Compl. ¶¶ 3, 41. The Complaint is devoid of any facts explaining how (1) an effort by the Union to interpret and enforce the CBA for the benefit of its members, (2) the Benefit Fund discharging its obligation to determine NYU's contribution amount, and (3) the League and the individually-named Hospitals engaging in no alleged conspiratorial conduct whatsoever amounts to an antitrust conspiracy. Under *Twombly*, a vague allegation of encouragement and acquiescence does not supply the missing facts.

To the extent NYU is claiming that the Union's alleged instruction to the Benefit Fund is an antitrust conspiracy, the complaint lacks any facts to support this inference under *Twombly*. But even if that were not the case, agreements between a union, like 1199, and a jointly trusteed labor-management trust fund, like the Benefit Fund, are protected against antitrust claims by the statutory labor exemption, 15 U.S.C. § 17. *See Tuvia Convalescent Ctr., Inc. v. Nat'l Union of Hosp. & Health Care Employees*, 553 F. Supp. 303, 307 (S.D.N.Y. 1982).

### 2. *The Union's Conduct Is Protected by the Non-statutory Labor Exemption*

As noted, NYU's obligation to contribute to the Benefit Fund arises from and is governed by the CBA. Indeed, health fund contribution rates are a mandatory subject of collective bargaining. A union's efforts to interpret and apply CBA provisions governing health fund contribution rates are protected by the non-statutory labor exemption.

The Second Circuit exempts labor agreements that (1) "further goals that are protected by national labor law and that are within the scope of traditionally mandatory subjects of collective bargaining" and (2) do not impose a "direct restraint on the business [*i.e.*, non-labor] market that has substantial anticompetitive effects . . . that would not follow naturally from elimination of competition over wages and working conditions . . . ." *Local 210, Laborers Int'l Union of N. Am. v. Labor Relations Div. Associated Gen. Contractors of Am.*, 844 F.2d 69, 79-80 (2d Cir. 1988) (citations omitted). The exemption is not "limited to protecting only terms contained in collective bargaining agreements," but "extends as far as is necessary to ensure the successful operation of

---

[2] NYU agrees that the dispute here is "over the implementation of the July 21, 2014 Memorandum of Agreement . . . between the League and the Union . . . ." 1/26/17 ltr. from Sanchez to McIver, at 1 (Ex. B). As you know, this Memorandum of Agreement is part of the CBA between the League and the Union.

the collective bargaining process." *Clarett v. Nat'l Football League*, 369 F.3d 124, 142-43 (2d Cir. 2004); *see also Brown v. Pro Football, Inc.*, 518 U.S. 231, 250 (1996) (exempting conduct that "grew out of, and was directly related to, the lawful operation of the bargaining process").

The determination of NYU's required Benefit Fund contribution is squarely protected by this exemption. As NYU acknowledges, the Fund exists to "provid[e] health insurance and other benefits to employees represented by 1199SEIU," Compl. ¶ 10, and NYU is required under the CBA to contribute to the Benefit Fund, *id.* ¶¶ 25-26. Wages, benefits, and other conditions of employment are core subjects of collective bargaining. *See, e.g.*, *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 509 (2d Cir. 2002). CBA provisions addressing core subjects are meaningful only to the extent they are implemented. Thus, the alleged efforts by the Fund and by the Union to enforce NYU's contribution obligations were "necessary to ensure the successful operation of the collective bargaining process," and satisfy the first prong of *Local 210*.

As to the second prong, an alleged agreement regarding NYU's healthcare contributions plainly does not directly restrain a business market. Rather, NYU alleges that the direct restraint was in the *labor* market, in adding to NYU's cost of providing employee benefits. *See, e.g.*, Compl. ¶¶ 3, 40. It also (speculatively) alleges a second restraint in the labor market—that the alleged conspiracy deterred other League members from exiting the League, thereby "align[ing] the competing hospitals in New York City at a more uniform [labor] cost structure." *Id.* ¶ 4. The alleged impact in a business market is attenuated, derivative, and speculative, based solely on NYU's claim that its additional payments in the labor market would make it less competitive in the alleged markets for inpatient and outpatient hospital services. *Id.* ¶ 51. This is precisely the type of indirect effect in a business market—flowing from an alleged direct restraint in a labor market—that cannot be the basis of an antitrust claim under the non-statutory labor exemption.

### 3.  *NYU Has Failed to Adequately Plead That the Alleged Conduct Harms Competition*

NYU has also failed to adequately plead that the alleged conduct harms competition. NYU must do more than allege a conspiracy; it must allege the conspiracy substantially reduced or eliminated competition in a relevant market. *See Capital Imaging Assocs., P.C. v. Mohawk Valley Med. Assocs., Inc.*, 996 F.2d 537, 543 (2d Cir. 1993) (must allege "challenged behavior" "had an actual adverse effect on competition as a whole"). NYU pleads that competition in the alleged markets for inpatient and outpatient hospital services in the New York City Metropolitan Area has been "substantial[ly] harm[ed]" because NYU annually has $25 million less to invest in new facilities, technology, and services. Compl. ¶¶ 49-51. The Complaint is silent as to the number and size of firms in these alleged markets, the amount invested annually in healthcare improvements in the markets, or any other facts to determine the materiality of an alleged $25 million reduction in investments by one firm among many in markets where many billions of dollars are spent each year. Indeed, NYU offers no allegations to suggest *total* investments in healthcare improvements in the alleged markets will decrease at all, much less materially so. The complaint alleges no barriers to other hospitals expanding their healthcare investments to take competitive advantage of any investment reduction by NYU. Competition can be harmed—a necessary element of NYU's claim—only if total, market-wide investments decrease materially.[3]

---

[3] In an effort to show that the alleged conspiracy deprived the market of more than $25 million/year in potential investment dollars, NYU speculates that its borrowing capacity has also been diminished. *See* Compl. ¶ 51.
*(continued)*

**COHENMILSTEIN**                                                                       Page 4

For the foregoing reasons, the Union believes that the claim against it is insufficient to survive a motion to dismiss, and should be voluntarily dismissed.

                Regards,

                / s / Daniel A. Small
                Daniel A. Small
                *Counsel for 1199SEIU United*
                *Healthcare Workers East*

Attachments

cc:    The Honorable Victor Marrero (by hand delivery)
        Ronald E. Richman, counsel for 1199SEIU National Benefit Fund
            (ronald.richman@srz.com)
        Derek Ludwin, counsel for the League of Voluntary Hospitals and Homes
            (dludwin@cov.com)
        Randy M. Mastro, counsel for The Mount Sinai Hospital, Montefiore Health System, Inc., The New York and Presbyterian Hospital, and Long Island Jewish Medical Center (rmastro@gibsondunn.com)

---

Even if it were plausible that an additional $25 million in annual labor costs would perceptibly change NYU's borrowing capacity, it alleges no facts showing that its borrowing capacity will be reduced enough that it cannot fund its intended capital projects. NYU Langone Medical Center (of which the Plaintiff hospitals are a substantial part) budgeted operating revenues of $6.365 billion for fiscal 2017. In other words, the disputed amount is 0.39% of NYU Langone's budgeted FY 2017 revenues. *See* https://www.nyu.edu/about/news-publications/budget.html.

# EXHIBIT 2

# CLEARY GOTTLIEB STEEN & HAMILTON LLP

NEW YORK  
PARIS  
BRUSSELS  
LONDON  
FRANKFURT  
COLOGNE  
MOSCOW

2000 Pennsylvania Avenue, NW  
Washington, DC 20006-1801  
T: +1 202 974 1500  
F: +1 202 974 1999

clearygottlieb.com

D: +1 (202) 974 1690  
dgelfand@cgsh.com

ROME  
MILAN  
HONG KONG  
BEIJING  
BUENOS AIRES  
SÃO PAULO  
ABU DHABI  
SEOUL

Daniel A. Small, Esq.  
Cohen Milstein Sellers & Toll PLLC  
1100 New York Ave. NW, 5th Floor  
Washington, DC 20005

September 22, 2017

**Re: NYU Hospitals Center v. League of Voluntary Hospitals and Homes of New York, *et. al*, No. 17-cv-4465 (S.D.N.Y)**
**Response to Defendant 1199SEIU United Healthcare Workers East**

Dear Daniel:

On behalf of Plaintiff NYU Hospitals Center ("NYU Hospital"), this responds to your letter dated August 23, 2017. We disagree with your arguments and intend to oppose your motion to dismiss. Additionally, although our initial Complaint adequately states a claim against your client, we are enclosing an Amended Complaint that should eliminate any doubt that NYU Hospital states a claim for relief.

At issue in this case is an agreement between 1199 and the other defendants to impose a multi-million dollar monthly penalty on hospitals that withdraw from the League. As explained in our response to the League and the hospital defendants, these penalty payments provide no additional benefit to employees and reduce competition in the market. Your client's president, George Gresham, admitted in a letter to NYU Trustees on February 7, 2017, that NYU Hospital is paying an additional tens of millions of dollars a year into the Fund for "exactly the same health benefit coverage" for its employees "with no offsetting benefit." *See* Ex. A. And Daniel Ratner, counsel for 1199, has acknowledged that the union's goal "is to bring NYU back into the League. It's in our members' interest and, I would argue, in the interests of the citizens of New York to have a very stable collective-bargaining situation in the health care industry. One hospital can disrupt it." *See* Ex. B. This is an anticompetitive goal, and 1199's agreement to use a financial penalty in pursuit of this goal violates the law. In this regard, our Amended Complaint includes an additional claim for relief under Section 303 of the Labor Management Relations Act, 29 U.S.C. § 187.

## NYU Hospital Has Properly Alleged an Unlawful Agreement

You assert in your letter that NYU Hospital failed to allege "conspiratorial conduct." However, "a plaintiff need only allege 'enough factual matter (taken as true) to suggest that an agreement was made.'" *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010) (quoting *Bell*

*Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). The Amended Complaint easily satisfies this standard.

NYU Hospital has alleged that the defendants had a meeting of the minds in 2014 to impose the penalty on any withdrawing League hospital, and your co-defendants have admitted as much in their letters to us. After agreeing to the July 21, 2014 Memorandum of Agreement ("MOA") to amend the existing collective bargaining agreement, 1199, the League, and the Fund worked together to create the penalty that is at issue in this case, even though it was not authorized in the MOA. The Fund gave notice in December of 2014 to all of the hospital defendants that a penalty would be imposed on withdrawing members and none of the defendants objected to NYU Hospital's knowledge.

The League and 1199 also worked together to create a new draft collective bargaining agreement covering the period 2014 to 2018, which contained the penalty provision. This draft document was never put through the required ratification process or circulated to League members, nor was it even executed by the parties to NYU Hospital's knowledge. Nonetheless, this provision was later used by 1199 – with the knowledge and acquiescence of the League – as the basis for an improper instruction to the Fund to assess the penalty on NYU Hospital after its lawful withdrawal from the League. Am. Compl. at ¶¶ 44-47. Even if the penalty provision had been validly incorporated in a collective bargaining agreement, your suggestion that your client's actions are exempt from antitrust scrutiny so long as they were undertaken to enforce the purported terms of the collective bargaining agreement is incorrect as a matter of law, as we explain in detail in our response to the League and hospital defendants' letters.

Under *Twombly*, plaintiffs are required to allege "only enough facts to state a claim to relief that is plausible on its face," 550 U.S. at 570, and these allegations do so. *See Anderson News, LLC v. Am. Media, Inc.*, 680 F.3d 162, 184 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 557) (demonstrating some "further circumstance pointing toward a meeting of the minds" provides a "setting suggesting the agreement necessary to make out a § 1 claim"); *see also Meyer v. Kalanick*, 174 F. Supp. 3d 817, 825 (S.D.N.Y. 2016) ("Sophisticated conspirators often reach their agreements as much by the wink and the nod as by explicit agreement").

### 1199's Conduct is Not Protected by the Non-Statutory Labor Exemption

Your arguments about the non-statutory labor exemption largely overlap the arguments made by the League, so we refer you to that response letter for an explanation of why the exemption does not apply and why the issue cannot be resolved on a motion to dismiss. *See, e.g., Conn. Ironworkers Emp'rs Ass'n v. New England Reg'l Council of Carpenters*, No. 16-485-cv, at *8 (2d Cir. Aug. 23, 2017).

1199 also argues that the existence of an NLRB complaint "is evidence that this case ... presents a labor dispute, not an antitrust claim." But the fact that there is an NLRB proceeding relating to a continuing education agreement and whether NYU Hospital properly withdrew from the League has no bearing on whether a multi-million dollar monthly penalty violates the law. The issues are separate and distinct. Resolution of the NLRB proceeding would not "moot the relief requested by" NYU Hospital because the anticompetitive effects of the withdrawal penalty remain the same. And again, this cannot possibly be sorted out until after discovery.

## NYU Hospital Has Properly Alleged Harm to Competition

The penalty imposed on NYU Hospital directly impacts its ability to invest and compete in the market for hospital services. This is "a per se violation of the antitrust laws." *Premier Elec. Constr. v. Nat'l Elec. Contractors Ass'n, Inc.*, 814 F.2d 358, 368-70 (7th Cir. 1986). Because the Amended Complaint alleges a per se violation of the antitrust laws, there is no requirement that NYU Hospital allege competitive harm. *See, e.g., N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 5 (1958) ("[T]here are certain agreements or practices which because of their pernicious effect on competition and lack of any redeeming virtue are conclusively presumed to be unreasonable and therefore illegal without elaborate inquiry as to the precise harm they have caused or the business excuse for their use"). Despite the fact that NYU Hospital is not required to do so, the Amended Complaint adequately pleads competitive harm.

The penalty imposed on NYU Hospital directly affects its ability to invest in improvements in the market for hospital services, which impacts the quality of care patients receive. "A plaintiff asserts harm to competition by alleging adverse effects on the price, quality, or output of the relevant good or service." *New York Medscan LLC v. New York Univ. Sch. of Med.*, 430 F. Supp. 2d 140, 146 (S.D.N.Y. 2006) (rejecting defendants' argument that "the complaint never identifie[d] any market-wide injury or effect on competition as a whole" because plaintiffs alleged an impact on price, quality, and output of services).

NYU Hospital alleges that while "in the recent past [it] has made substantial investments in new facilities and new technology and service capabilities," it is now "less able to make these investments," because the withdrawal penalty provision "has the effect of … removing hundreds of millions of dollars in future investments in health care capacity and improvements, all to the detriment of competition and to the welfare of patients in the New York City Metropolitan Area." Am. Compl. at ¶¶ 63, 70. NYU Hospital has also alleged further harm to market-wide competition because its "competitors are now under less competitive pressure to respond to NYU Hospital's investments" than in the past. *Id.* at ¶ 63. Such a "decline in quality is among the injuries that the antitrust laws were designed to prevent." *New York Medscan*, 430 F. Supp. 2d at 148.

\* \* \*

For the foregoing reasons, a motion to dismiss the Amended Complaint on the grounds articulated in your letter would be without merit. We look forward to proceeding promptly to discovery in this case.

Sincerely,

*David I. Gelfand /SEA*
David I. Gelfand

Attorneys for Plaintiff
NYU Hospitals Center

cc: The Honorable Victor Marrero; all counsel of record

3

# EXHIBIT 3

# RESOLUTION
# OF
# THE BOARD OF TRUSTEES ("TRUSTEES")
# OF
# THE 1199SEIU NATIONAL BENEFIT FUND FOR HEALTH AND HUMAN SERVICE EMPLOYEES ("NBF")

(RESOLUTION TO AMEND UNIFORM REQUIRED RATE, TO ESTABLISH REQUIRED RATES FOR LEAGUE EMPLOYERS IN ACCORDANCE WITH THE JULY 2014 AGREEMENT AND REQUIRED RATES FOR NON-LEAGUE EMPLOYERS AS SET BY THE TRUSTEES)

*October 27, 2014*

**WHEREAS**, the Trustees are required and authorized by their duties under the Agreement and Declaration of Trust ("Trust Agreement") to determine Rates of Contributions required for an employer to be accepted or remain as a Contributing Employer; and

**WHEREAS**, contribution rates are set forth in Collective Bargaining Agreements (CBAs) between employers and 1199SEIU United Healthcare Workers East ("1199SEIU"); and

**WHEREAS**, 1199SEIU and the League of Voluntary Hospitals and Homes New York ("League") have entered into a Collective Bargaining Agreement ("CBA") that covers the majority of NBF participants, extending through April 30, 2015; and

**WHEREAS**, the Trustees have established a Uniform Required Rate ("URR"), which was amended most recently by interim resolution of the Trustees dated August 18, 2014 ("August 2014 Interim Resolution"), amending the Prior URR Resolutions[1]; and

**WHEREAS**, the Union and the League have reached a Memorandum of Agreement dated July 21, 2014 modifying the CBA ("July 2014 MOA"), providing that the URR of 28.05% of gross wages shall remain in effect until the Contribution due September 30, 2014 based on August 2014 payroll, at which point, for League Member Employers, a Contribution Rate with Cap Methodology will go into effect; and

**WHEREAS**, the Union and the League have entered into a September 18, 2014 agreement ("Transition Agreement"), attached as Exhibit A, which provides that the Actuaries

---

[1] February 14, 2014 URR resolution ("February 2014 Resolution"), which amended a URR resolution dated September 21, 2009 (the "2009 Resolution"), which amended a preceding URR resolution (the "2007 Resolution") (together, "Prior URR Resolutions") providing, inter alia, that through the Contribution due September 30, 2014 based on August 2014 payroll, the URR for all Contributing Employers in the NBF shall be 28.05%[1] of gross wages

and the Fund Staff shall develop a methodology to implement the Contribution Rate with Cap Methodology; and

**WHEREAS,** the Union and the League, by letter dated October 24, 2014, attached as Exhibit B, subsequently have agreed to implement the Contribution Rate with Cap Methodology by a flat payment rate methodology, as explained in the Fund's actuaries' report dated October 24, 2014, attached hereto as Exhibit C ("Flat Rate Methodology"), which shall determine for each Employer a flat monthly payment ("Flat Rate") which subsequently will be adjusted prospectively through reconciliations with the amount that would have been paid based on actual wages and employment data for the period under the Employer-specific Contribution Rate with Cap Methodology, as specified in Exhibit C ("League Required Contribution Rate"); and

**WHEREAS,** to implement the League Required Contribution Rate, matters related to the ongoing administration of the NBF contributions for League employers, including but not limited to: changes to billing unit - employer mapping, triggers for changes in employer payment calculations, changes in employer reporting requirements and supporting documentation for employer payment calculations including breakdown of wages and overtime, will be determined by the League and Fund staff and will be incorporated into a letter agreement between the League and the Union, which is hereby incorporated herein by reference; and

**WHEREAS,** Article VIII, Section 5 of the Trust Agreement provides that "the Trustees shall adopt and implement any Plan or program of benefits they are directed to implement by a provision in a Major Collective Bargaining Agreement ("MCBA") if such Plan or program of benefits will be funded on an actuarially sound basis and is in the interest of Plan Participants"; and

**WHEREAS,** the July 2014 MOA, as modified as indicated above, constitutes an MCBA; and

**WHEREAS,** the Trustees wish to amend the URR to reflect the July 2014 MOA, as modified; and

**WHEREAS,** working with the Fund actuaries, the Trustees have determined the benefit rates required for Non-League Employers to adequately fund the benefit plan, based on the Non-League wages, reduced by HWE/RN Credits as determined by the Fund actuaries, allocation of surplus, and other factors as specified in Exhibit C, and excluding overtime wages paid by Non-League Not for Profit Nursing Homes (together, "Non-League Rate"); and

**WHEREAS,** the Trustees wish to implement for the Non-League Employers a Non-League Flat Rate contribution methodology similar to the League Flat Rate Methodology, as set forth in Exhibit C which shall determine for each Non-League Employer its Required Contribution ("Flat Rate") which subsequently will be adjusted prospectively through reconciliations with the amount that would have been paid based on actual wages and employment data for the period, under the Employer-specific Non-League Rate, as specified in Exhibit C ("Non-League Required Contribution Rate"); and

**WHEREAS,** the Fund's actuary has presented a letter, dated October 24, 2014,

attached hereto as Exhibit D, finding that if the foregoing rates and methodologies are adopted by the Trustees, the Fund will be funded on an actuarially sound basis; and

**IT IS RESOLVED**, therefore, that the provisions of the Prior Resolutions concerning the URR are hereby superseded by establishing the Required Contribution Rates ("RCR") for each individual Contributing Employer, as follows:

    A. The League RCR for each League Member Contributing Employer:

        (1) shall remain at 28.05%[2] of gross wages minus applicable credits through the Contribution due December 30, 2014 based on November 2014 payroll; and

        (2) for the nine month period effective with the January 2015 Contribution, shall be the monthly Flat Rate for each League Member Employer, determined by the Fund's actuaries as set forth in Exhibit C, as the sum of: (a) the projected amount calculated for the League Employer for that nine month period under the Contribution Rate with Cap Methodology, divided by nine; and (b) a projection of the difference between: (x) contributions computed at 28.05% of gross wages minus applicable credits and (y) the Contributions that would have been made by that League Employer under the Contribution Rate with Cap Methodology for the period October 2014 through December 2014, divided by nine; and

        (3) effective with the October 2015 Contribution, and thereafter, for each annual cycle from October through the following September, shall be the monthly Flat Rate for each such League Member Employer, as determined by the Fund's actuaries as set forth in Exhibit C, as the sum of (a) the projected amount calculated for that Employer for that year under the Contribution Rate with Cap Methodology, divided by twelve, and (b) a reconciliation of the difference between: (x) the amounts paid under the Flat Rate methodology for the previous period(s) and (y) the amounts that would have been paid by that League Employer under the Contribution Rate with Cap Methodology over that same previous period(s), based on actual employment and salary data for the period(s), divided by twelve; and

    B. The Non-League RCR for each Non-League Contributing Employer:

        (1) shall remain at 28.05%[3] of gross wages minus applicable credits

---

[2] The URR for Contributing Employers whose employees do not participate in the 1199SEIU Health Care Employees Pension Fund and are not eligible, therefore, to receive retiree health benefits from the NBF, shall be reduced by .5%.

[3] The URR for Contributing Employers whose employees do not participate in the 1199SEIU Health Care Employees Pension Fund and are not eligible, therefore, to receive retiree health benefits from the NBF, shall be

      through the Contribution due December 30, 2014 based on November 2014 payroll; and

(2) for the nine month period effective with the January 2015 Contribution, shall be the monthly Flat Rate for each Non-League Member Employer, determined by the Fund's actuaries as set forth in Exhibit C, as the sum of: (a) the projected amount calculated for that Non-League Employer for that nine month period under the Non-League Rate, divided by nine; and (b) a projection of the difference between: (x) contributions computed at 28.05% of gross wages minus applicable credits and (y) the Contributions that would have been made by that Non-League Employer under Non-League Rate for the period October 2014 through December 2014, divided by nine; and

(3) effective with the October 2015 Contribution, and thereafter, for each annual cycle from October through the following September, shall be the monthly Flat Rate for each such Non-League Member Employer, as determined by the Fund's actuaries as set forth in Exhibit C, as the sum of (a) the projected amount calculated for that Non-League Employer for that year under the Non-League Rate, divided by twelve, and (b) a reconciliation of the difference between: (x) the amounts paid under the Flat Rate methodology for the previous period(s) and (y) the amounts that would have been paid by that Non-League Employer under the Non-League Rate over that same previous period(s), based on actual employment and salary data for the period(s), divided by twelve;

**BE IT FURTHER RESOLVED** that:

Matters related to the ongoing administration of the NBF contributions for League employers will be determined by the League and Fund staff and will be incorporated into a letter agreement between the League and the Union, which is hereby incorporated herein by reference. The Fund staff is authorized to adopt any provisions of this administrative agreement to Non-League Employers, as applicable.

**BE IT FURTHER RESOLVED** that:

A Non-League Contributing Employer whose memorandum of agreement or collective bargaining agreement expired, or hereafter expires, on or after September 30, 2014 (said expiration date referred to herein as the "Expiration Date") or does not otherwise provide for adoption of this Resolution as of September 30, 2014, shall: as of the 30th day of the month ("Due Date") immediately after the Expiration Date, contribute at the RCR specified in this Resolution above adjusted for a reconciliation of the difference between: (x) its actual NBF contributions remitted on or after September 30, 2014 and (y) the amounts that would have been paid by that Non-League Employer under the Non-League Rate over that same previous

reduced by .5%.

period(s), based on actual employment and salary data for the period(s), under the methodology described in this Resolution the "Differential") further adjusted by interest accrued on the Differential at the rate of 6.75% per annum from January 1, 2015 through the date of payment of the Differential. Any Differential and interest accrued thereon which is not remitted to the Fund by the Due Date shall be deemed delinquent contributions, the collection of which shall be subject to the applicable terms of the Contributing Employer's collective bargaining agreement or memorandum of agreement. In addition, the failure of the Contributing Employer to pay the Differential and interest accrued thereon will result in the cessation of the Fund's provision of benefits to the Contributing Employer's participating employees in accordance with the Fund's delinquency policies.

**BE IT FURTHER RESOLVED** that:

Any provision of the Prior URR Resolutions not amended by or inconsistent with this Resolution shall remain in full force and effect.

**BE IT FURTHER RESOLVED** that:

The Executive Director and her designees are authorized, empowered and directed in the name of and on behalf of the NBF, from time to time to execute and deliver such other and further documents, and to do and perform such other acts and things as the Trustees might deem necessary or advisable to carry the foregoing resolution into effect.

_____          _____
**UNION TRUSTEE**          **DATE**                **EMPLOYER TRUSTEE**          **DATE**